# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

No. 20-7029                                              September Term, 2020

FILED ON: MARCH 2, 2021

JOSEPH D. RASSA,
                APPELLANT

v.

AMTRAK, DOING BUSINESS AS NATIONAL RAILROAD PASSENGER CORPORATION,
                APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-02024)

---

Before: HENDERSON, PILLARD and RAO, *Circuit Judges*.

## **J U D G M E N T**

The court considered this appeal on the record from the United States District Court and the briefs of the parties. D.C. Cir. R. 34(j). The panel has accorded the issues full consideration and has determined that they do not warrant a published opinion. *See* D.C. Cir. R. 36(d). It is hereby

**ORDERED AND ADJUDGED** that the judgment of the district court be **AFFIRMED**.

Joseph Rassa, a white man, contends that his employer, the National Railroad Passenger Corporation (Amtrak), discriminated against him on the basis of race in violation of 42 U.S.C. § 1981. Rassa was medically disqualified from his job as a Passenger Engineer for eight months after he failed a mandatory color-vision acuity examination and subsequent color-vision field test, and he claims that Amtrak refused to reassign him to a position that did not require color vision even as it reassigned black employees who failed the same vision tests. He does not question the validity of the vision testing. As Rassa puts it, his "discrimination claim is about others [who failed vision testing] being transitioned to jobs that Rassa was not even interviewed for." Reply 7. Amtrak reinstated Rassa to his prior position following his successful completion of a color-vision field test, and Rassa remains employed there.

Rassa appeals the district court's grant of Amtrak's motion for summary judgment and its related motion to strike two exhibits. Rassa did not produce the exhibits in discovery but nonetheless attached them to his opposition to Amtrak's summary judgment motion. We need not decide whether the district court permissibly excluded the exhibits because, even considering them, Amtrak is entitled to summary judgment. As we have acknowledged, it is "unnecessary to rule upon the[] actual admissibility" of exhibits submitted in opposition to summary judgment when "there would not be a genuine dispute over a material fact even if [they] were admitted." *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007).

Amtrak is entitled to judgment because the record—with or without the excluded exhibits—does not include evidence on which a reasonable jury could find Rassa similarly situated to the black Amtrak employees he claims as comparators, or that Rassa even requested reassignment to another position that did not require color vision. One of Rassa's late-proffered exhibits consists of emails that appear to be from a third-party service that facilitated Amtrak's screening of employees to fill open positions. On their face, the emails acknowledge Rassa's expressions of interest in job openings but also describe "mandatory next steps for new applications" that he did not show he completed. *E.g.*, App. 47 (formatting modified). Indeed, he does not acknowledge having ever seen those emails prior to this litigation, and speculates that they may have been caught in his email spam filter and later automatically deleted. *See* Appellant's Br. 16-17. The other exhibit at issue is an expert report by someone not identified as an expert in this case who opined on commonalities among various Amtrak jobs. The report was written in 2012 and submitted in another case to which Amtrak was a party. It does not speak to the particular jobs held by Rassa or his claimed comparators.

We review the district court's grant of summary judgment *de novo*. *See, e.g.*, *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 492 (D.C. Cir. 2008). To prevail under Section 1981, Rassa must show that he was subjected to intentional racial discrimination in violation of the equal "right . . . to make and enforce contracts"—a right defined to include "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)-(b); *see Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) ("Section 1981 prohibits private employers from intentionally discriminating on the basis of race with respect to the 'benefits, privileges, terms, and conditions' of employment." (citations omitted)). Section 1981 "was 'meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race.'" *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295-96 (1976)). "In Section 1981 and Title VII cases, courts use the same framework for determining whether unlawful discrimination occurred." *Ayissi-Etoh*, 712 F.3d at 576 (citations omitted). Under Section 1981, as under Title VII, a litigant may rely on circumstantial evidence "suggesting that the employer treated similarly situated persons who were not the same race as the plaintiff more favorably than it treated the plaintiff." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296-97 (D.C. Cir. 2015) (citing *Brady*, 520 F.3d at 495).

Even taking the exhibits as admissible, the evidence raises no genuine factual dispute as to Rassa's claim of discriminatory intent. The evidence falls short in two ways, each of which is independently fatal to his claim: The employees Rassa says failed vision tests but continued to

2

work either simply did not fail any test or were not in positions materially similar to Rassa's when they did. The record also lacks evidence that, upon failing his vision tests, Rassa applied for or otherwise asked Amtrak to reassign him to a position not requiring color vision, as his identified comparators had. We explain each defect, and the inability of the excluded evidence to remedy it.

First, the employees Rassa identifies are not valid comparators. Rassa's intent claim rests on his assertion that similarly situated black employees were accommodated after failing vision tests, whereas he was not. But the three employees that Rassa identifies—Rodney Peters, Nigel Thierens, and Rodney Brown—are not similarly situated to Rassa in "all of the relevant aspects of [his] employment situation." *Burley*, 801 F.3d at 301 (quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)). Amtrak's evidence confirms that Peters was never medically disqualified, *see* App. 43, and Rassa adduced no evidence to dispute the point. As for Thierens and Brown, evidence shows that, when they were medically disqualified, they both had different jobs from Rassa's and worked under different supervisors. *See* App. 37-38, 43-46. The record shows that they, like Rassa, were placed temporarily on inactive status without pay. *See* App. 44-45, 93-94. Rassa objects that they were then placed in alternate positions, but he points to no evidence that they were subject to the same policies, or that their supervisors followed the same practices as his, regarding alternate job placements of medically disqualified employees.

The record, sparse as it is, reflects the lack of material similarity. At the time of his disqualification, Rassa was a Passenger Engineer, *i.e.*, someone who operated locomotive engines. The "essential functions" of his job included "[a]dher[ing] to and compl[ying] with train orders, bulletin orders, wayside signals, [and] railroad operating rules"; "[p]erform[ing] transit operations ensuring movement orders are clearly understood with the Conductor, Yardmaster and Dispatchers"; and "[p]erform[ing] required tests and inspections before and after all runs." App. 38. By contrast, Thierens was an Assistant Passenger Conductor within the train's passenger compartments. He was responsible for "supervis[ing], observ[ing] and adher[ing] to all safety requirements and work operations while ensuring operating procedures are clearly understood"; "[a]ssist[ing] passengers boarding and detraining at station stops" and "[e]nsur[ing] all revenue is collected"; and "[c]heck[ing] and control[ling] ventilation, lighting, water, heating and cooling systems." App. 43-44. Brown, whose job description as an On-Corridor Yard Engineer was closer to Rassa's, *see* App. 45, drove trains within a railyard as opposed to on a route and worked on a different team and under a different supervisor than Rassa, *compare* App. 45 (at the time of his disqualification, Brown worked on the "'YD PENN/SUNNY' Cost Center/Team under the supervision of Charles J. Lawrence"), *with* App. 39 (at the time of his disqualification, Rassa "was a member of Amtrak's 'RD PSGR CRW BAL/MDOT' Cost Center/Team, and he was supervised by Edward T. Downes"). Rassa says that Howard Carter, not Downes, was his supervisor at the time of his disqualification, *see* App. 22, 103, but any dispute is immaterial because Rassa does not contest Amtrak's evidence that neither Brown nor Thierens was supervised by Carter or worked on the same team as Rassa. Thierens' and Brown's different treatment in their distinct jobs and situations is not, without more, probative of employer bias. *See Burley*, 801 F.3d at 301-02.

The expert report that Rassa sought to introduce—to the extent that Rassa even challenges its exclusion here, *compare* Appellant's Br. 5-7 (providing detail on the report), *with id.* at 15-19

3

(discussing only the district court's decision to strike his exhibit of emails)—cannot make up the shortfall. The report's broad assertions about the "fundamentally shared function" of Amtrak's employee groups, App. 69, and statements that "the work performed within the craft and within the classification[] is the same" "[r]egardless of work site," App. 70, are far too general to establish that any of the three employees Rassa identifies is an appropriate comparator. The report says nothing about the various different types of engineers employed by Amtrak or whether they were subject to the same policies or practices regarding accommodation of color blindness; if anything, it suggests that engineers like Rassa and conductors like Thierens do not even share the same "occupation[]." *See* App. 66.

Second, Rassa fails to show that he actually sought reassignment to any particular Amtrak job for which he was qualified during his period of medical disqualification, as Thierens and Brown undisputedly did. *See* App. 45-46; *see also* App. 93-94. Even if we consider with the rest of the evidence the emails the district court struck, Rassa's proof on this point, too, falls short. Rassa's only request for accommodation was that he be reinstated to the position he held when he was medically disqualified. *See* App. 121; *see also* Ex. 2, Pl.'s Reply Mem. Supp. Mot. Summ. J., ECF No. 25-2, *Rassa v. Amtrak*, No. 18-cv-02024-TJK (D.D.C.) (Aug. 23, 2019) (Rassa's request for accommodation). The emails in Rassa's proffered exhibit do not show otherwise; to the contrary, they merely acknowledge Rassa's expression of interest in a handful of positions and state mandatory next steps for completing applications to the positions at issue. *See, e.g.*, App. 47. There is no evidence—nor even any direct assertion on Rassa's part—that he completed those steps. *See* Appellant's Br. 24-25. More fundamentally, beyond asserting that, "to the best of [his] knowledge," the other positions did not require color vision, App. 108; *cf.* App. 110 (stating that "[m]any" of those positions did not require color vision), Rassa adduced no evidence that he was qualified for them. *See also* App. 134-36 (district court commenting on the lack of any evidence that Rassa was qualified for any of the positions referenced in the exhibit).

Rassa claims that, in light of the emails he proffered, Amtrak's interrogatory response stating that "Plaintiff never requested reassignment to a position that did not require him to meet the . . . color vision acuity standards," App. 94 (emphasis omitted), is false, so supports an inference of discriminatory intent. But, as discussed above, even considering the emails, the record lacks evidence that Amtrak was aware of any reassignment request on Rassa's part. There is thus no basis on which a reasonable jury could "infer that [Amtrak's] explanation is not only a mistaken one in terms of the facts, but a lie" concealing racial animus. *Burley*, 801 F.3d at 296 (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1293 (D.C. Cir. 1998) (en banc)).

One would expect in a case like this one that Rassa would have sought at least a deposition of an Amtrak manager, perhaps under Federal Rule of Civil Procedure 30(b)(6), to make a record of the process for reassignments of employees on medical leave, including the relationship and information flow between Amtrak and the third-party service that sent the emails. But Rassa did very little discovery, taking no depositions at all, then failed to show good cause for an extension of the discovery period. *See* Appellant's Br. 8; *see also* App. 122. In response to Amtrak's summary judgment motion, Rassa did not supply evidence from which a jury could fairly infer that he was subjected to discrimination based on his race.

4

For the foregoing reasons, we affirm the judgment of the district court.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate until seven days after resolution of any timely petition for rehearing or rehearing *en banc*. *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41.

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:  /s/
Daniel J. Reidy
Deputy Clerk